77 F.3d 490
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Jerry TANNER, Plaintiff-Appellant,
v.
ILLINOIS TOOL WORKS, INC. d/b/a ITW Devcon; ABI Corp.;
Hermetite Products, Ltd., a/k/a Stag Ltd., a/k/a
Astor Stag Ltd., Defendants-Appellees.
 No. 95-35030.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Jan. 9, 1996.
Decided Feb. 21, 1996.
 
 Before: NOONAN, LEAVY and HAWKINS, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 PROCEEDINGS BELOW
 
 2
 Appellee Jerry Tanner filed this suit in Oregon state court in May 1993 alleging claims of strict liability and negligence because of a disabling skin condition he claims he suffered as a result of using a product called Epoxy Mending Putty. Tanner's original complaint named defendants Balkamp, Inc., Genuine Parts Company (NAPA), and ITW Devcon. Balkamp, NAPA, and ITW Devcon removed this case to federal district court in June of 1993. These defendants filed a third party complaint joining Hermetite Products, Inc. (Hermetite US), Hermetite Products, Ltd. (Hermetite UK), and ABI Corp. as defendants. Hermetite UK and ABI Corp. alleged in their Answer that the court lacked personal jurisdiction over them.
 
 
 3
 Tanner has settled his claims against Balkamp and NAPA. His claims against ITW Devcon, Hermetite UK, Hermetite US, and ABI Corp. remain.
 
 
 4
 After the close of discovery, ITW Devcon moved for summary judgment on the basis that Tanner had failed to prove that it had distributed the product that injured him. ABI Corp. and Hermetite UK moved for summary judgment based on a lack of personal jurisdiction. In October 1994, the district court granted summary judgment in favor of ABI, Hermetite UK, and ITW Devcon.
 
 
 5
 The district court, pursuant to Rule 54(b), directed the entry of final judgment as to Hermetite, ABI and ITW Devcon. Tanner timely appealed this judgment.
 
 FACTS
 
 6
 Jerry Tanner is now 59 years old. He was working as a machinist on September 12, 1991 on a construction project in Multnomah County, Oregon. He needed to repair a broken piece of equipment and went to a local NAPA auto parts store. He bought a product called Epoxy Mending Putty, packaged under the Balkamp and NAPA labels. He took it back to the job site and used it by rubbing it in his hands as the product's label directed. The packaging did not warn about skin sensitivity, the toxicity of epoxy resins, or the need to use gloves or a barrier cream when using the product.
 
 
 7
 Tanner immediately reacted adversely to the product. His condition spread to other parts of his body through what is known as a Koebner reaction. As a result, he has been disabled from his work as a machinist since early 1992. He currently has trouble walking and performing other daily functions since the skin condition spread to his feet and other parts of his body. Tanner claims that this epoxy is the cause of his physical disabilities.
 
 
 8
 The epoxy was supplied to the NAPA store by Balkamp, a company which is affiliated with NAPA and which sells only to NAPA stores. The epoxy had been manufactured in 1984 by a company called Hermetite UK, which was incorporated in and had its operations in England. Hermetite UK sold some of this batch of epoxy to Hermetite US, which marketed the product in the United States. Between 1984 and 1986, Balkamp bought epoxy directly from Hermetite US. There is no record of how many packages Balkamp purchased from Hermetite US. These packages became part of Balkamp's distribution system and would have been sold at NAPA stores.
 
 
 9
 In 1986, Balkamp negotiated with ITW Devcon for the purchase of products for the NAPA private label. In 1986, ITW Devcon purchased 20,000 packages of the Hermetite epoxy and the marketing and sales rights for the name "Hermetite" from Hermetite UK and Hermetite US. Between 1986 and 1988, ITW Devcon sold all 20,000 packages to Balkamp. At no other time did ITW Devcon distribute this product.
 
 
 10
 Balkamp does not have any shipping records that show whether the product sold to Tanner at the NAPA store in Portland had been initially obtained directly from Hermetite US or from ITW Devcon. The product has no lot numbers, packaging dates, or expiration dates. Shipping records do indicate that Balkamp shipped epoxy from its distribution center in Utah to Portland in 1991, near the time that Tanner purchased the putty from the NAPA store.
 
 
 11
 Hermetite UK was owned by Associated British Industries, Ltd. Associated British Industries also owned ABI Corp. in the United States. ABI Corp. is incorporated in the state of Delaware and does no business in Oregon and maintains no offices in Oregon. ABI Corp. owned Hermetite US, which had been established as a company to market Hermetite products. Hermetite US is now defunct.
 
 ANALYSIS
 
 12
 I. THE DISTRICT COURT WAS CORRECT TO DISMISS THE CLAIMS AGAINST HERMETITE UK AND ABI CORP. BECAUSE IT LACKED PERSONAL JURISDICTION
 
 
 13
 The district court's determination that it lacked personal jurisdiction is a question of law and is reviewed de novo. Omeluk v. Langston Slip & Batbyggeri A/S, 52 F.3d 267, 269 (9th Cir.1995). The district court determined it did not have personal jurisdiction over Hermetite UK and ABI Corp. because they lacked sufficient minimum contacts with the state of Oregon.
 
 
 14
 For personal jurisdiction to lie, it must comport with the state's long arm statute and with the constitutional guarantee of due process. In this case, Oregon's long arm statute grants personal jurisdiction to the extent due process allows. The due process clause protects a defendant's "liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful contacts, ties or relations." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 471-72 (1985) (quotation omitted). Foreseeability of causing injury in another state is not a sufficient basis to establish personal jurisdiction. Id. at 474.
 
 
 15
 The Ninth Circuit employs a three-pronged test to determine if the exercise of personal jurisdiction is proper. See Core-Vent Corp. v. Nobel Industries AB, 11 F.3d 1482, 1485 (9th Cir.1993). First, did the defendant purposefully direct his activities toward the forum state, such that the defendant availed himself of the privilege of conducing activities in the forum state, invoking the benefits and protections of its laws. Id. Second, did the plaintiff's claim arise out of defendant's forum-related activities. Id. The third prong asks whether the exercise of personal jurisdiction would be reasonable. Id. Only the first and third prongs of this test are at issue in this case.
 
 
 16
 Tanner has failed to produce any evidence showing that Hermetite UK purposefully availed itself of Oregon as a forum.[1] While Hermetite US was established as a marketing company for Hermetite UK's products in the United States, it only had a contractual relationship with Hermetite US, and Hermetite US was not obligated to purchase products from Hermetite UK. And although Hermetite US and Hermetite UK shared a parent company, Tanner failed to show that Hermetite UK was responsible for establishing Hermetite US as a marketing channel for its products or that it directed its activities. It appears that Hermetite US was pretty much a shell with a staff consisting of a manager and a secretary, and with a single warehouse. But without a clearer link between the two companies, there is not a sufficient basis to establish personal jurisdiction over Hermetite UK.
 
 
 17
 As for ABI Corp., Tanner has failed to show that ABI Corp. had any contacts with Oregon and fails to put forth any arguments in his brief in favor of finding personal jurisdiction over ABI Corp. Thus, we find there is not a sufficient basis for jurisdiction over ABI Corp.
 
 
 18
 II. THE DISTRICT COURT WAS CORRECT TO GRANT SUMMARY JUDGMENT FOR ITW DEVCON BECAUSE THERE WAS NO DISPUTE OF MATERIAL FACT THAT TANNER HAD NOT SHOWN THAT IT WAS MORE LIKELY THAN NOT THAT ITW DEVCON HAD DISTRIBUTED THE EPOXY THAT INJURED TANNER
 
 
 19
 This court reviews de novo a grant of summary judgment. Jesinger v. Nevada Federal Credit Union, 24 F.3d 1127, 1130 (9th Cir.1994). On review, the evidence must be viewed in the light most favorable to the nonmoving party. Anderson v. Liberty Lobby, 477 U.S. 242, 255 (1986). Because this court has jurisdiction through diversity of citizenship it must apply the law of the state of Oregon to evaluate Tanner's claims of strict liability and negligence against ITW Devcon. Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938).
 
 
 20
 Under Oregon law, Tanner must prove that it was more likely than not that ITW Devcon was the distributor of the package of epoxy that injured him. Senn v. Merrell-Dow Pharmaceuticals, 305 Or. 256, 269-70, 751 P.2d 215, 222-23 (1988). p "[P]laintiff can get to the jury if there is a rational basis for concluding that it was more probable than not that the defendant's failure to exercise reasonable care was the cause of the accident." Conger v. Dant & Russell, Inc., 250 Or. 480, 483, 443 P.2d 201, 202 (1968).
 
 
 21
 Tanner has come forth with little, if any, evidence that makes it more likely than not that ITW Devcon, not Balkamp, was the distributor of the epoxy. Tanner argues that because ITW Devcon distributed the epoxy later in time than Balkamp it is more likely that the epoxy Tanner bought in 1992 came from ITW Devcon. Balkamp purchased epoxy on its own behalf before 1986 but purchased 20,000 packages from ITW Devcon between 1986 and 1988.
 
 
 22
 That the product from ITW Devcon was purchased later in time by Balkamp is not a sufficient basis for determining that the product Tanner purchased was distributed by ITW Devcon. This product has no expiration date or lot number that indicates its source, and Balkamp did not segregate the epoxy it bought from ITW Devcon from that it bought directly from Hermetite US. The packaging is also identical. Furthermore, ITW Devcon's shipping records show that the epoxy it supplied to Balkamp went to Balkamp's Indianapolis distribution center while Tanner claims the epoxy that he bought came from Balkamp's Utah distribution center. There is no record that shows a transfer of epoxy from one distribution center to the other. Because this epoxy has no identifying characteristics that mark its source there is nothing Tanner can point to that would make it more likely that the epoxy came from ITW Devcon rather than directly from Balkamp. See Conger, 250 Or. at 483; 443 P.2d at 202.
 
 CONCLUSION
 
 23
 Because Tanner did not come forth with sufficient facts linking Hermetite UK and ABI Corp. with Oregon, we AFFIRM the district court's grant of summary judgment in their favor. As Tanner has failed to come forth with any facts showing it more likely than not that ITW Devcon distributed the package of epoxy that harmed him, we AFFIRM the district court's grant of summary judgment in favor of ITW Devcon.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Cir.R. 36-3
 
 
 [1]
 The contours of the purposeful availment requirement are far from settled. Although four Justices in Asahi Metal Indus. Co. v. Superior Court, 480 U.S. 102 (1987), cast significant doubt on the validity of the traditional "stream of commerce" test, see Omeluk v. Langsten Slip & Batbyggeri, 52 F.3d 267, 271 (9th Cir.1995) (noting that if the portion of Asahi attacking the stream of commerce test is the law, then the stream of commerce test "is no longer the law of this circuit"), reports of the test's post-Asahi demise have been exaggerated. See, e.g., Dehmlow v. Austin Fireworks, Inc., 963 F.2d 941, 946-47 (7th Cir.1992) (refusing to depart from traditional stream of commerce test after considering Asahi ); Irving v. Owens-Corning Fiberglass Corp., 864 F.2d 383, 386 (5th Cir.) (same), cert. denied, 493 U.S. 823 (1989). Because we believe that appellant fails to satisfy the purposeful availment requirement even under the relatively lenient pre-Asahi version of the stream of commerce test, we do not decide what effect, if any, Asahi has on our purposeful availment jurisprudence